## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KAREN K. SCHULTE,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Case No. 03-CV-361-K (M)** |
| | ) | |
| **JOHN E. POTTER, Postmaster** | ) | |
| **General, USPS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### FINDINGS OF FACT
### AND CONCLUSIONS OF LAW

The above-styled case was tried to the Court without a jury on March 23-25, 2005 and March 28, 2005. Post-trial briefing has been completed. After considering the pleadings, the testimony and exhibits admitted at trial, all of the briefs and arguments presented by counsel for the parties, and being fully advised in the premises, the Court enters the following Findings of Fact, Conclusions of Law and Judgment, in accordance with FED. R. CIV. P. 52, as follows:

### FINDINGS OF FACT

1.  Karen Schulte ("Ms. Schulte") is a Caucasian female.

2.  Ms. Schulte is an employee of the defendant, the United States Postal Service ("USPS"). She worked as a Rural Carrier Associate from 1994 until 1999. From 1999 until present, she has worked as a Rural Carrier.

3.  Ms. Schulte was born on June 9, 1941, and, at all relevant times, was over forty years of age. She was also over age forty when hired by the Postal Service.

4.  Ms. Schulte alleged age bias as the cause for (1) her March 5, 2002, discipline where termination was proposed, but ultimately mitigated to a lengthy suspension, and (2) the non-

selection of her 2002 application to a management training program, referred to as the Associate Supervisor Program or "ASP."

## FINDINGS OF FACT:  TERMINATION

5.    Ms. Pam Cameron ("Ms. Cameron") is a clerk employed by the Postal Service. She testified that, during March 2002 at the Chimney Hills Station, it was her responsibility to bring mail in during the mornings and then sort it to the correct carrier.   The carriers continued to "throw" or distribute mail as necessary during the day, including throwing mail which were "misthrows."   Misthrows refer to mail matter which had already been distributed, but to a wrong route.  Carriers would recognize the mail as not belonging to their route and bring it to the misthrow case for the clerks to redistribute.  The misthrow case is a large structure with different bins.  The clerks redistribute the mail to the correct carrier through the "hot case."

6.    The clerks learn the outermost boundaries of the entire route, but not each individual address therein.  If a carrier recognizes an address as being within their boundaries, but being a non-existent or non-deliverable piece of mail, the carrier must endorse it before returning it to the clerk.

7.    Ms. Cameron had learned the "scheme" (defined as the route organization for a particular route) for Ms. Schulte's route twenty years earlier and had distributed mail to that scheme for approximately twenty years, either in the main plant or at Chimney Hills Station.

8.    On March 5, 2002, the Chimney Hills Station was undergoing a rural carrier "mail count." Rural carriers, such as Ms. Schulte, are paid by piece work and the volume of mail is tracked over the particular days of the year designated as "mail count" days.  Every piece of mail

2

belonging to the carrier's route is physically counted during this time so as to extrapolate an annual salary.

9.     During a mail count, a carrier who receives mail and knows it has been counted must inform the counter if the mail piece (or pieces) did not actually belong to their particular route.

10.    During mail count, many carriers keep precise track of how much mail volume the counter is recording.   Fifteen to sixteen extra counted pieces of mail can inflate an annual salary by as much as $1600.

11.    On March 5, 2002, Ms. Cameron noticed that she was repeatedly getting the same pieces of mail through her misthrow case.   She correctly sorted it, paying special and particular attention and taking care to be sure it was sorted to the correct route.   When the mail came back, Ms. Cameron decided to mark the mail with a small "x" to make absolutely sure that the same mail was coming through the misthrow case.

12.    Ms. Cameron testified she actually observed Ms. Schulte return mail marked with an "x" to the misthrow case.

13.    Ms. Cameron also testified that there would be no innocent explanation for the same mail pieces coming through as misthrown multiple times.   Plaintiff never offered any innocent explanation for the same, marked mail pieces having been returned to the misthrow case multiple times.

14.    Ms. Cameron concluded Ms. Schulte was intentionally putting mail correctly sorted to her route in the misthrow case, allowing the clerk to sort the mail to her route, retrieving the mail from the hot case and inflating her mail count.   If the mail was returned time and again to the misthrow case, only to be distributed to Ms. Schulte again through the hot case, the same

3

mail was being counted over and over and recorded on the mail count.

15.   Ms. Lila Lawrence ("Ms. Lawrence") was Ms. Schulte's immediate supervisor on March 5, 2002. Ms. Lawrence received information regarding the recirculation of mail during the mail count from Ms. Cameron.

16.   Based on this information, she asked Ms. Schulte to leave the floor and come into her office.

17.   At that time, Ms. Lawrence, without argument or question, agreed to eliminate any piece of mail Ms. Schulte claimed was not on her route and not consider those pieces of mail. Ms. Lawrence considered only the mail that Ms. Schulte admitted that she recognized, by sight, as mail that did belong on her route. Ms. Lawrence did not consider as evidence the mail that Ms. Schulte did not recognize (for any reason) as belonging to her route. All actual mail pieces were delivered to the appropriate mail customers on that day.

18.   Ms. Lawrence copied the mail to preserve a record of the exact pieces of mail being recirculated. Besides all written and photocopied materials, Ms. Lawrence considered certain oral statements and her own observations. Ms. Lawrence wanted to see (and did observe) Ms. Schulte recirculate the mail to satisfy herself that Ms. Schulte was acting improperly. Ms. Cameron confirmed that Ms. Lawrence instructed her to distribute the mail and see if it came back. Ms. Lawrence stated that Ms. Cameron, the clerk who had sorted the mail and noticed the recirculation, was never inconsistent in her account of the relevant events and that she had been throwing the same scheme for twenty years.

19.   The only explanation that Ms. Schulte ever offered was that another rural carrier – Don Miller – pulled her mail by mistake and placed it all in the misthrow case. Ms. Lawrence testified that Mr. Miller expressly denied that any such thing happened on the day in

4

question. O.D. Curry ("Mr. Curry"), a labor relations specialist for the Postal Service, considered this explanation, interviewed Mr. Miller and satisfied himself that Ms. Schulte's explanation was simply not plausible.

20.    If the recirculated mail had belonged to Ms. Schulte's route, but contained a bad address or non-existent address, Ms. Schulte should have endorsed the mail. The endorsement would essentially be communication to the clerk that would discontinue the recirculation.

21.    On or about March 26, 2002, Ms. Schulte received a letter proposing her termination for dishonest behavior and obstruction of efficiency and rural count accuracy in violation of the Employee and Labor Relations Manual. Within the letter, the charge is explained in detail:

> On March 5, 2002, during the Rural Carrier National Mail Count, scheme clerks observed that mail pieces found in misthrows were being repeatedly worked off your route. These pieces were identified as misthrows from route 3746. The clerk shared her concerns with the supervisor and affirmed the mail was properly addressed to route 3746. The mail pieces were marked with an "x" and returned to your route for proper casing and delivery. You again failed to work or case the mail and improperly returned the mail to the misthrow case. Evidence indicates that this mail is properly schemed to your route and should have been cased and delivered as addressed. Your improper repeated return of properly addressed mail served to inflate your mail count and needlessly caused employees to waste time on unnecessary distribution. You would have received actual times in your evaluation for unnecessary trips to the throwback case inflating your R column time. Your actions were clearly calculated to increase your elevated route time.

(Defendant's Trial Exhibit 7.)

22.    Ms. Lawrence proposed removal and was responsible for requesting such discipline. At the time, Ms. Lawrence did not know Ms. Schulte's age. No one pressured or influenced Ms. Lawrence in her decision; rather, she considered the recirculation of mail to be tantamount to stealing from the Postal Service. The Postmaster of Tulsa, Susan Beck ("Ms. Beck"),

confirmed in her testimony that Ms. Lawrence had the authority to take such actions. While Ms. Beck, as Postmaster, would probably be made aware that a carrier was being terminated, her concurrence is not necessary. The clerk, Ms. Cameron, had no involvement in the disciplinary decision made by Ms. Lawrence.

23. At approximately this same time, another rural carrier, Sherry Birt (Ms. Birt), received a proposed termination for alleged dishonesty during the mail count.

24. Ms. Lawrence was responsible for the discipline of Ms. Birt. Ms. Lawrence did not know the age of Ms. Birt or Ms. Schulte.

25. Ms. Birt filed a grievance through the Union. During the very first stage of the grievance process, Ms. Birt accepted an offer by management to reduce the punishment and return to work.

26. Ms. Schulte also filed a grievance, but would not return to work under the same circumstances as Ms. Birt. Despite her representative's ability to negotiate the same settlement as allowed Ms. Birt to return to work, Ms. Schulte refused.

27. Ms. Schulte filed an Equal Employment Opportunity ("EEO") Complaint of Discrimination in the Postal Service on May 21, 2002. Within this formal charge, she identified her removal as the adverse employment action prompting the charge, but only cited retaliation for previous EEO activity (and not age discrimination) as the basis for an EEO charge. This is inconsistent with her allegation (set out below) that discriminatory statements regarding age had been made to her for months before May 21, 2002.

28. Ms. Schulte alleged that Mr. Tom Mullins, who participated in the rural mail count in 2002, asked her about retirement plans. Ms. Schulte "associate[s]" Mr. Mullins with her attempted

removal because he wrote a witness statement about what he observed on the day she recirculated mail. However, Ms. Schulte failed to establish any nexus or connection between alleged comments of Mr. Mullins and Ms. Lawrence's decision to propose her termination in March 2002.

29.   Ms. Schulte's testimony that Mr. Mullins' comments evidenced age discrimination is wholly contradicted by her own behavior. She alleges that Mr. Mullins made the comment in February of 2002, as the mail count was starting. Yet, when she filed her EEO complaint just three months later to complain about her firing, she did not even bother to allege age as a purview of discrimination.

30.   Ms. Schulte testified that she disagreed with Mr. Mullins' counting of her mail and told him as much. Ms. Schulte stated that this disagreement happens "every year at every count". Ms. Schulte went so far as to show up on her day off to argue with her relief carrier about whether certain mail had been counted. Another carrier complained that Ms. Schulte had wrongfully taken a parcel from his route to her area in order for it to be counted and attributed to her route.

31.   Ms. Lawrence completed an evaluation in connection with Ms. Schulte's application to the 2002 ASP program. Although the instructions on the front sheet of the evaluation say that ratings of "Not Acceptable" should be explained, Ms. Lawrence did not write any statement about her rating of Ms. Schulte. Ms. Schulte was found to be deficient in several areas. Ms. Lawrence testified that she failed to read the instructions which would require explanation of negative ratings at the time and was unaware of the instruction until just several weeks before the trial of this matter.

7

32.  Ms. Schulte admitted at trial that she has absolutely no evidence of any kind to support her allegation that Ms. Lawrence's actions in proposing her removal were motivated by age bias. While Ms. Schulte denied recirculating mail, she never presented evidence of any kind that Ms. Lawrence did not hold the genuine belief that she had recirculated mail. In fact, she admitted that, in lieu of age bias, she believed that Ms. Lawrence was a "victim" of unspecified others. Others who reviewed Ms. Lawrence's decision and course of action with respect to Ms. Schulte's removal confirmed that she had made a proper and appropriate decision.

33.  Mr. Steve Lundak was the station manager and Ms. Schulte's supervisor through January 2002. He had the opportunity to fill out a review that would accompany Ms. Schulte's application to the ASP program in 2000. At the time he filled out the review, Ms. Schulte had never performed any work as a supervisor; rather she had only worked as a rural carrier or rural carrier associate. Mr. Lundak testified that Chimney Hills is a large station and supervisors, such as Ms. Lawrence, have more information about the performance of a carrier than he would as station manager. Whereas a supervisor, such as Ms. Lawrence, would see carriers on a day-to-day basis, Mr. Lundak testified that many days could go by without his seeing individual rural carriers.

34.  Ms. Lawrence believed that Ms. Schulte performed adequately as a carrier, but had concerns about her performance as a supervisor at the Chimney Hills Station. Ms. Lawrence answered an evaluation form regarding Ms. Schulte's ASP candidacy honestly, based upon her nine months of observation of Ms. Schulte in the exact supervisory position for which she was applying. Nothing on the form indicates it would be improper for Ms. Lawrence to draw

8

from all sources of information she had available to complete her evaluation of Ms. Schulte.

35.    Mr. Jeff Dalton, a labor relations specialist for the Postal Service, testified that he initially received "generalities and no specifics on exactly what Ms. Schulte did" and was missing a "trail of mail matter" to support general allegations. He later interviewed Ms. Cameron, Ms. Lawrence and Laura Zaremba ("Ms. Zaremba") regarding exactly what had happened and how mail matter was marked to verify the allegations. He later obtained the photocopied pieces of mail which had been marked to document and verify Ms. Schulte's recirculation of mail matter. Having copies of the actual mail that Ms. Schulte recirculated allowed the elimination of innocent explanations for mail returning again and again to the misthrow case.

36.    Mr. O. D. Curry, a labor relations specialist with expertise in the rural carrier area, also testified that, early on, he and Mr. Dalton did not have copies of the mail pieces.

37.    Jeff Dalton routinely represents the USPS in labor arbitration matters. In such arbitration matters, the USPS would have the burden to prove just cause existed for removal of an employee, such as Ms. Schulte.

38.    Neither Mr. Dalton nor Mr. Curry was free to contact Ms. Schulte to discuss the matter because it could result in a charge of an unfair labor practice under the labor contract

39.    At an arbitration proceeding related to Ms. Schulte's removal, Mr. Dalton did, in fact, represent the Postal Service. The arbitrator found Ms. Schulte guilty of recirculating the mail.

40.    Mr. Curry could remember "a number" of carriers under age 40 whose removal was proposed after misconduct during the count.

41.    At trial, Ms. Schulte proffered the testimony of Pauline Quinn, a clerk at Chimney Hills.

However, Ms. Quinn could not even remember whether she was at the Station the date Ms. Schulte allegedly recirculated mail. She could only offer possible ways in which mail could be returned to the misthrow case one time, but made clear that she could not offer any testimony about what Ms. Schulte did on the date in question.   Moreover, specifically referring to Ms. Quinn's statement, Mr. Curry indicated that the information contained therein was investigated, by way of correspondence, conversations and even a visit to the Chimney Hills Station.   Ms. Quinn's information involved situations or circumstances which simply did not exist on the actual day in question, such as mislabeled containers or tubs of morning mail from the main plant. Ms. Quinn's theory that continuous errors in recognizing a scheme could not apply where Ms. Schulte acknowledged, on sight, that the mail in question belonged to her route.

### FINDINGS OF FACT:
### 2002 ASSOCIATE SUPERVISOR PROGRAM APPLICATION

42.   On February 19, 2002, the USPS issued a vacancy announcement for the Associate Supervisor Program ("ASP"), Customer Service.

43.   The ASP is a program utilized by the USPS to select, train and place supervisors. To apply for the ASP, the applicant must submit the appropriate papers in response to an announcement.   Applications are reviewed by a committee of postal officials, a test is administered, and personal interviews are conducted with a different committee of postal officials.

44.   Ms. Schulte applied for the ASP, Customer Service position by submitting a Form 991, in which basic background and experience is recited. Ms. Schulte also included, as referenced

in the vacancy announcement and as an attachment to her Form 991, her Statement of Achievement for certain Knowledge, Skills, and Abilities (or "KSA's"). Six specific areas (Leadership, Decision Making, Human Relations, Communications, Safety and Employee/Management Relations) were identified, and Ms. Schulte wrote a narrative to describe achievements that best demonstrated mastery of the area.

45. The Form 991 and attached KSA's were analyzed by a committee composed of four postal officials: (1) Susan J. Beck (Postmaster of Tulsa); (2) George F. Frame (Postmaster of Oklahoma City); (3) Elizabeth Inman (then Postmaster of Muskogee), and (4) Jacqueline Bouffard (then Manager of Training).

46. The Form 991 and attached KSA's were provided to these individuals for review with names and identifying information redacted. Applicants were identified by number. Individual committee members were to read, evaluate and rate the KSA's of the applicants on an individual basis.

47. A meeting was held on June 3, 2002, to prepare the "Consensus List of Ratings." This document was to represent the consensus of the reviewing officials and their best exercise of business judgment as to the degree of satisfactory responses provided on the KSA portion of each application.

48. At the meeting the officials used the letters "ND" to indicate that an applicant had not demonstrated their achievement of a particular KSA. A number of applicants, including Ms. Schulte, received "not demonstrated" ratings on one point or another and their applications were eliminated for any further consideration for the ASP program.

49. The youngest applicant reviewed did not advance and neither did the oldest applicant. Such

11

evidence does not support any presumption of any discriminatory bias, either for or against older applicants, on the part of the Form 991 review committee.

50.    Plaintiff presented no evidence that any committee member in the 2002 ASP application review process calculated or estimated Ms. Schulte's age or the age of any other applicant. Plaintiff presented no evidence that any committee member in the 2002 ASP application review process did not honestly and accurately judge the applications submitted according to their training and written guidelines. Three of the four board members testified and each testifying board member specifically testified that no calculations of age, no discussion of age and no discussion of identity of applicants occurred. Each testifying board member testified that no undue influence by any other member affected their consensus in 2002. Each testifying board member testified that they had been subjected to some training in order to perform their review and/or had available specific guidelines which they attempted to apply.

51.    George Frame, Postmaster of Oklahoma City, reviewed Ms. Schulte's 2002 ASP application. He never knew who she was and he never had information about her age.

52.    Mr. Frame explained why the KSA section of Ms. Schulte's application failed to explain a problem, noting that her narrative regarding decision-making simply described the daily activities of the regular activities of a carrier.

53.    Both Mr. Frame and Ms. Beck explained that Ms. Schulte's application failed to adequately discuss decision-making because Ms. Schulte described doing things that a rural carrier position did not have the authority to do.

54.    Ms. Beck, Postmaster of Tulsa, reviewed Ms. Schulte's 2002 ASP application. She did not

know Ms. Schulte's age until a week before this matter went to trial.

55.   Ms. Beck testified that, by the time the ASP applications were reviewed, she was aware that Ms. Schulte's removal was pending. Had she suspected that one of the applications she was reviewing was Ms. Schulte's, Ms. Beck testified she would have called labor to see if someone with a pending removal was even eligible for consideration for the ASP program. This evidence indicates that Ms. Beck did not attempt to identify the ASP applicants.

56.   Mr. Randy Robinson (age 46), also a rural carrier at Chimney Hills, testified that he had to go through the ASP screening procedure three times before being chosen for an ASP position. He attempted to become an ASP at the same time as Ms. Schulte (in 2002) and was unsuccessful.

57.   Under a similar procedure, a different committee was assembled in 2000 to review Ms. Schulte's application for the ASP, Processing and Distribution.   "Processing and Distribution Operations" is commonly referred to as *plant* operations and is different from *customer service*, which primarily concerns carriers and contact with the Postal customer. This 2000 committee for Processing and Distribution ASP's consisted of George Roberts, Jr., Manager, Human Relations; Donne Collins, Post Office Operations Manager, and Rick Shirley, Manager of In-Plant Support.

58.   The 2000 committee for ASP, Processing and Distribution, reviewed Ms. Schulte's Form 991 and attached KSA's and found them to be satisfactory for their purposes.   Her application advanced to the personal interview stage , although Ms. Schulte ultimately was not selected for the ASP, Processing and Distribution in 2000.

59.   Ms. Beck testified that review committees filling ASP positions for the *plant* (Processing and

13

Distribution) would be expected to have different results from a review committee filling ASP positions for *customer service*.

60.   Ms. Schulte presented no evidence which suggests that members of the 2002 reviewing committee for Customer Service ASP were not free to exercise his or her own judgment regarding evaluation of Ms. Schulte's KSA's. There is no evidence that the 2002 committee was bound by or would even have reason to know of the rating given by a previous committee when considering Ms. Schulte for a different ASP. Ms. Beck testified that different review board members may have different opinions based upon their individual experiences with the Postal Service.

61.   Ms. Schulte has failed to establish any nexus or connection between her failed applications to various training and detail programs and the ASP committee's unfavorable action on her 2002 ASP application.

62.   Ms. Schulte did not present any evidence of discriminatory animus by the officials who reviewed her Form 991 and KSA's (Susan J. Beck, George F. Frame, Elizabeth Inman, and Jacqueline Bouffard) in 2002. She could not recall any jokes, workplace incidents or derogatory comments concerning age, not even any general comments on the subject of age by any of these decision makers.

63.   Mr. Steve Lundak was Ms. Schulte's supervisor until January of 2002, when he became Post Master of Mannford.

64.   Ms. Schulte alleged that Steve Lundak ("Mr. Lundak"), her former supervisor, said that there are no 204-B temporary supervisors or ASP candidates who are over age fifty. At trial, Mr. Lundak, testified to the contrary, offering names of specific persons who he believed to be

14

over age 50 who served as 204-B supervisor trainees.  As such, Mr. Lundak "definitely" disagreed with Ms Schulte's testimony that the two ever spoke about age discrimination. When asked about Ms. Schulte's contention that he had said the USPS does not train persons over age 50 for supervision, he replied: "That statement never came from me." Tr. at p. 168. Mr. Lundak testified that he did not know the identity of the persons who would review Ms. Schulte's application to the ASP program and did not know the identity of the persons who were on the ASP review board.

65.    Ms. Schulte's actions are wholly inconsistent with her testimony about Mr. Lundak's statements concerning age discrimination.  Her actions are more consistent with Mr. Lundak's denial that any such issue was discussed.  She alleges that he told her the USPS discriminates based on age in February of 2002, but three months later, when she filed an EEO concerning her proposed termination, she did not even identify age discrimination as a possible purview of discrimination.

66.    Ms. Schulte failed to establish any nexus or connection between alleged comments made by Mr. Lundak and the unfavorable decision made by reviewers of her Form 991 and KSA's in 2002.  Moreover, Mr. Lundak's comments would not reasonably relate to the ASP decision makers at issue, because Mr. Lundak did not even know their identity.

67.    Ms. Schulte could not have become elevated to supervisor in the USPS during the time her removal was pending and she would not have even been considered if the committee had identified her as someone with removal pending.  Mr. Dalton only provided information to the ASP coordinators about Ms. Schulte's pending removal after June 3, 2002 (the date of the meeting the 2002 ASP application review committee assembled and, together, found Ms.

15

Schulte's application to be unacceptable).

68.     Consequently, even if Ms. Schulte had not received an "ND" and progressed in the application process, she would have been eliminated from further consideration once Mr. Dalton made the ASP coordinators aware of Ms. Schulte's pending removal.

69.     Ms. Schulte admitted that she applied for positions for which she was clearly not eligible for, according to the clear terms of the vacancy announcement.

70.     Ms. Schulte listed areas of interest for details, such as facilities design and electric vehicle maintenance. She presented no evidence that details in such areas of interest ever existed at a time she was eligible for detail assignments.

71.     At trial, Ms. Schulte proffered the testimony of an expert witness, Mr. Thomas Stone. Mr. Stone could not offer any empirical data to support any conclusion that the USPS hiring system was infected by age bias. Although Mr. Stone believed something "weird" was happening, he admitted he could not eliminate a number of other non-age related biases.

72.     Mr. Stone failed to review relevant evidence, such as testimony or statements by the ASP decision makers or the guidelines utilized by the ASP decision makers. Mr. Stone was completely unaware that Ms. Schulte applied for the *plant* ASP program in 2000 and the *customer service* ASP program in 2002. Mr. Stone insisted that the fact that Ms. Schulte was not selected "speaks for itself" and could not offer any other support for his accusations of age bias.

73.     Mr. Stone concluded the ASP review committee acted properly and appropriately when it excluded the youngest member of the applicant pool, but assumed that bias must explain the elimination of the oldest member of the applicant pool (Ms. Schulte). Mr. Stone admitted

16

that the only reason for his accusation of age bias was because Ms. Schulte was the oldest member of the 2002 applicant pool and she was eliminated.

74.    Although Mr. Stone admitted that an entirely different committee reviewed Ms. Schulte's 2002 application than reviewed her 2000 application, he made no allowance for innocent differences of opinion, but rather, assumed that age bias would explain differences between the committees.

75.    At trial, Ms. Schulte called Gus Reinolds. Mr. Reinolds has been employed by the USPS in positions related to transportation services and contracts in Texas through the 1990's until the present.   In 1980, for approximately three years, Mr. Reinolds worked in human resources in Tulsa.

76.    Mr. Reinolds never had any involvement in any situation involving Ms. Schulte's employment with the USPS or her application for the ASP program.

77.    At trial, Ms. Schulte also called Lynn Jones as a witness. Ms. Jones has been Postmaster for several small communities in Oklahoma for twenty years.  Ms. Jones claimed that the following events (which she attributed to age bias) were visited upon her: (1) when she was 49 years old, her boss asked if she wanted to downgrade, causing her to believe she was being "put out to pasture"; (2) she was made to submit an application Form 991, but others were not; (3) a requirement that employees stay in a current position until having served at least one year was only "true for some people"; and, (4) as Postmaster, her requests for support staff were "delayed."

78.    Ms. Jones never identified any of the decision makers or other employees involved in any of these alleged adverse employment decisions. Ms. Jones never properly identified the age,

17

name or job of any comparitor employees. There was absolutely no evidence regarding the identity of the alleged discriminating official; much less any evidence that any person involved in any of these alleged adverse employment decisions had anything to do with Ms. Schulte's application to the ASP program in 2002. None of the alleged adverse employment actions that Ms. Jones testified about had any similarity to Ms. Schulte's contention that her 2002 ASP application was wrongfully rated as unacceptable.

79.    Ms. Jones admitted that she has nothing to do with Ms. Schulte's application to the ASP program in 2002 and stated: "I don't know anything about Ms. Schulte's case." (Tr. at p. 128).

80.    To the extent that any of these Findings of Fact constitute Conclusions of Law, they should be so considered.

## II.    CONCLUSIONS OF LAW

81.    The "familiar *McDonnell-Douglas* ping-pong analysis is unnecessary at trial:  Instead the ultimate test is whether plaintiff has produced enough creditable evidence to persuade the trier of fact that defendant acted with discriminatory intent and that such intent caused plaintiff's injury." *Dodoo v. Seagate Technology, Inc.*, 235 F.3d 522, 528 (10th Cir. 2000).

82.    In ADEA cases, "the plaintiffs' age must have 'actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (alteration in original) (quoting *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

83.    Age-related comments referring directly to the plaintiff can support an inference of age discrimination, but "isolated [or] ambiguous comments" may be, as here, too abstract to

18

support such an inference. *Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) (quoting *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993), *cert. denied*, 510 U.S. 861 (1993)). The court in *Cone* further reasoned that "[i]solated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions." *Id.* (citing *Leichihman v. Pickwick Int'l*, 814 F.2d 1263, 1271 (8th Cir. 1987), *cert. denied*, 484 U.S. 855 (1987)). A plaintiff must demonstrate a nexus exists between the allegedly discriminatory statement and the company's decision, and therefore "that age actually played a role in the defendant's decision making process and had a determinative influence on the outcome." *Rea v. Martin Marietta Corp.*, 29 F.3d 1450, 1455 (10th Cir. 1994) (citing *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993)).

84.     In a claim for intentional discrimination, the only issue is whether the decision maker intentionally discriminated against the plaintiff when he initiated the adverse employment action. *Selenke v. Medical Imaging of Colorado*, 248 F.3d 1249, 1261 (10th Cir. 2001) ("When assessing a contention of pretext, we assess the facts 'as they appear to the person making the decision to terminate [the] plaintiff.'") (*quoting Kendrick v. Penske Transp. Servs. Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)). The litigant may not simply point out that the employer was mistaken about a particular fact. *Hardy v. S.F. Phosphates Ltd. Co.*, 185 F.3d 1076 (10th Cir. 1999). Nor is it sufficient for a litigant to simply complain that the punishment was harsh or unreasonable. *See Pollard v. Rea Magnet Wire Co., Inc.*, 824 F.2d 557, 560 (7th Cir. 1987) ("No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, Title VII ... [does] not interfere."), *cert. denied*, 484 U.S. 977 (1987); *Fuentes v. Perskie*, 32 F.3d 759,

765 (3d Cir. 1994) (the issue is "whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent"); *Pollis v. The New School for Social Research*, 132 F.3d 115, 124 (2d Cir. 1997) (absent showing it was motivated by discriminatory intent, bad treatment does not establish a violation of Title VII); *Gill v. Reorganized School Dist. R-6, Festus, Mo.*, 32 F.3d 376, 379-80 (8th Cir. 1994) (holding that whether the defendant's decision was incorrect or based on inaccurate information is irrelevant).

85.  When the plaintiff alleges that the stated reason for the employment action is really pretext for discrimination, the Tenth Circuit "requires [the Court] to look at the facts as they appear to the person making the decision to terminate plaintiff." *Kendrick*, 220 F.3d at 1231 (citing *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1209 (10th Cir. 1999)) (noting that it is the manager's perception of the employee's performance, and not the employee's subjective evaluation of her performance, that is relevant in determining pretext).

86.  Even if the decision maker reached a wrong conclusion, the employer is not liable to the plaintiff unless the decision was motivated by illegal age bias. *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) (finding that plaintiff failed to establish pretext where the defendant discharged plaintiff after conducting an investigation into a subordinate employee's allegations of sexual misconduct on the part of the plaintiff and believed the allegations to be true, even though plaintiff presented evidence to the district court that the allegations may have been false); *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312 n. 12 (10th Cir. 1992) ("[A] mistaken belief can be a legitimate reason for an employment decision and is not necessarily pretextual.")). So, even if Ms. Lawrence reached the wrong conclusion

20

about the recirculation of mail, Ms. Schulte has failed to sustain her burden by showing that Ms. Lawrence's action was based on age bias.

## CONCLUSIONS OF LAW:  TERMINATION

87.   Ms. Schulte did not establish that the proposed termination was motivated by illegal age discrimination.

88.   Even if the Court were to accept Ms. Schulte's statement that she did not recirculate mail, she has failed to carry her burden in this case.  In a recent case from the District of Kansas, a plaintiff was fired because the employer believed she had submitted improper expense account records.   *Vega v. Sprint Corp., (PCS)*, 2004 WL 2414100, *13 (D.Kan.). (unpublished).  There, the court noted that the Tenth Circuit requires examination of "the facts as they appeared to the person who made the termination decision." *See Kendrick*, 220 F.3d at 231; *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) (no pretext where defendant discharged plaintiff after investigating allegations of sexual misconduct and believed them to be true, even though plaintiff presented evidence that allegations may have been false).  Here, Ms. Schulte has presented no evidence that Ms. Lawrence did not genuinely develop a belief that she had recirculated mail and act based upon that belief.  Likewise, Ms. Schulte presented no evidence that Ms. Lawrence was motivated by age bias and lied about the reason for proposing Ms. Schulte's termination in order to cover up such bias.

89.   "[I]t is irrelevant whether the Postal Service's decision may have been based on incorrect facts, so long as its decision was not motivated by discriminatory or retaliatory animus." *Brown v. Henderson*, 2000 WL 1762509, *8 (E.D. La.) (citing *Scales v. Slater*, 181 F.3d 703,

711 (5th Cir.1999)). (Unpublished).

90.  Ms. Schulte offered evidence of allegedly discriminatory comments and employment decisions which were unrelated to either the proposed termination in March 2002 or the decision maker who initiated the March 2002 proposed termination (Ms. Lawrence). According to *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 151-53 (2000), only actions and comments by the actual decision maker or by one who was "principally responsible" for the adverse employment action at issue is relevant.  Consequently, statements and decisions by Postal officials other than Ms. Lawrence (or the Station Manager Laura Zaremba) are irrelevant. *See Kotlowski v. Eastman Kodak Co.,* 922 F. Supp. 790, 801 (W.D.N.Y. 1996) (stray comments by co-workers without supervisory control over plaintiff do not rebut defendant's stated nondiscriminatory reason for terminating plaintiff).

91.  Ms. Schulte alleged that Tom Mullins asked about her retirement plans. The uncontroverted evidence established that Mr. Mullins was not the actual decision maker, nor was he principally responsible for the proposed termination of the Plaintiff.  Without a nexus between Mr. Mullins' alleged inquiry and Ms. Lawrence's decision, the statement is irrelevant.  Re, 29 F.3d at 1455.  Moreover, comments about plans to retire or about retirement benefits are not sufficient to give rise to an inference of age discrimination and are, at best, stray comments which are irrelevant to the issue of actual age bias. *Howard v. Garage Door Group,* 2005 WL 481564 (10th Cir.) (comment by supervisor that plaintiff should check into Social Security benefits is insufficient to support inference of discrimination) (unpublished), *Holmes v. Regents of University of Colorado,* 1999 WL 285826 (10th Cir.) (plaintiff's overhearing conversations regarding the possibility of her

imminent retirement was not sufficient evidence to find inference of age discrimination) (unpublished), *Thompson v. Cendant Corp.*, 130 F. Supp.2d 1255, 1262 (N.D. Okla. 2001) ("remarks about the timing of future retirement made by co-workers and supervisors are best characterized as 'stray remarks' by a non-decision maker"); *see also Thomure v. Phillips Furniture Co.*, 30 F.3d 1020, 1023, 1025 (8th Cir. 1994) (supervisor's suggestion that employee protesting pay cut might want to consider retiring did not reflect a discriminatory animus). The alleged inquiry regarding retirement is legally insufficient to show age bias.

92.　　"[A]ge-related comments by non-decision makers are not material in showing the [employer's] action was based on age discrimination." *Cone*, 14 F.3d at 531.

93.　　A plaintiff wishing to prove discriminatory animus with evidence that his employer treated him differently from other employees bears the burden of showing that the comparison is legally relevant, *i.e.*, that the employees were similarly situated. *Watts v. City of Norman*, 270 F.3d 1288, 1293 (10th Cir. 2001), *cert. denied*, 535 U.S. 1055 (2002). Ms. Schulte admitted that she and Ms. Birt were not similarly situated because Ms. Birt was willing to admit her wrongdoing and accept early settlement of her grievance.

94.　　The only comparable employees Ms. Schulte attempted to identify were Sherry Birt and Tony

23

Burt, ("Mr. Burt")[1] who also received discipline as a result of improper conduct (albeit of a different sort) during the rural mail count in 2002. Importantly, the Plaintiff failed to introduce evidence as to either comparator's actual *age*. Without such evidence, the court cannot determine whether Ms. Birt is a legally relevant comparison or not. *Munoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1166 (10th Cir. 2000) (holding "that because plaintiff's replacement was only two years his junior, an obviously insignificant difference, the necessary inference of discrimination was precluded, and he failed to establish his prima facie case") The court cannot assure Ms. Birt is substantially younger and, consequently, cannot draw any inference because of allegedly disparate treatment of Ms. Birt.

95.    Ms. Schulte only offered her own opinion of Ms. Birt's age. Case law establishes that such evidence is incompetent to create an age claim. *Nwangwa v. Federal Exp. Corp.*, 2003 WL 262057, **3 (7th Cir.) (where plaintiff merely offers his own opinion on alleged comparitor employees' age and disciplinary record, and the record lacks any evidence of their actual age, or disciplinary history, summary judgment was properly granted), *cert. denied*, 540 U.S. 821 (2003).

96.    In any event, the supervisor of both Ms. Lawrence and Ms. Birt treated the workers *exactly the same* – Ms. Lawrence proposed removal for both and offered to mitigate the punishment after each worker filed a grievance.

97.    In order to show a disparity in treatment that could reasonably be attributed to age, the

---

[1]Although Ms. Schulte identified Mr. Burt as a possible comparator employee during her trial testimony, she presented no evidence as to the specific reason for the disciplinary action taken against him, nor the resolution of those actions. Ms. Schulte also did not present any evidence as to Mr. Burt's age.

comparison employee should be outside the relevant protected group. The Court has no evidence whether Ms. Birt is *in* or *out* of the protected class, because Plaintiff failed to introduce evidence to establish Ms. Birt's age. *See* 29 U.S.C. § 631(a) (defining protected group as individual over 40).

98.   Ms. Birt was willing to sign an agreement and compromise her grievance against the USPS to return to work. Ms. Schulte, when faced with the same proposal, refused. The USPS acted entirely consistent with a genuine belief that the removal letter was appropriate and correct. The employer may consider a failure to admit wrongdoing to administer different punishment for similar wrongdoing. *Vigil v. Colorado Dep't of Higher Educ.,* 1999 WL 407479, ** 6 (10th Cir.) (unpublished).

99.   Ms. Schulte was well into the class protected by the ADEA – she was over fifty years of age – when hired at the Postal Service. This fact may be considered as weighing against her claim of a causal connection between her discipline and her age. *Lowe v. J.B. Hunt Transport, Inc.,* 963 F.2d 173, 174 (8th Cir. 1992) (fact that plaintiff was a member of the protected age group both at the time of his hiring and at the time of his firing was significant to district court's finding of no pretext); *Rand v. CF Industries, Inc.,* 42 F.3d 1139, 1147 (7th Cir. 1994) ("It seems rather suspect to claim that the company that hired [plaintiff] at age 47 'had suddenly developed an aversion to older people' two years later.").

100.  Ms. Schulte may not simply point out her belief that the evidence supporting her proposed discharge was not sufficient or that further investigation should have been conducted. *Smith v. Chrysler Corp.,* 155 F.3d 799, 807 (6th Cir. 1998). "Title VII does not ensure that employees will always be treated fairly or that they will be [disciplined] only for meritorious

25

reasons." *Archuleta v. Colorado Dep't of Institutions*, 936 F.2d 483, 487 (10th Cir. 1991).

101.    Plaintiff has not demonstrated, nor does the record suggest, any "weaknesses, implausibilities, inconsistencies, incoherencies, or contradiction in the employer's proffered legitimate reasons for its action" such that a reasonable finder of fact could find the reasons unworthy of belief. *See Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

102.    The ADEA protects older employees from being fired because of their age; it does not protect employees from being fired without good cause. *Visser v. Packer Eng'g Assoc., Inc.*, 924 F.2d 655, 657 (7th Cir.1991).

103.    A court, in addressing a Title VII claim, may admit an arbitral decision as evidence and accord it such weight "as the court deems appropriate." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 (1974). The finding of the arbitrator supports this Court's finding that no pretext exists and that the reasons described in Ms. Schulte's termination letter were genuine in the mind of the decision maker.

104.    Ms. Schulte apparently claims that the investigation into her recirculation was incomplete. At trial, however, she never established that the investigation regarding Ms. Schulte was any different than any other investigation ever conducted by Ms. Lawrence or the labor relations specialists. There is no evidence whatsoever regarding the investigation into Ms. Birt's wrongdoing, for instance.

105.    The ADEA does not make employers liable for petty, "stupid," or "even wicked decisions"; "it makes them liable for discriminating, for firing people on account of their age." *Norton v. Sam's Club*, 145 F.3d 114, 120 (2d Cir. 1998), *cert. denied*, 525 U.S. 1001 (1998). Even if the investigation was incomplete or unfair, plaintiff must offer evidence that the decision

maker took the action that she took because of the plaintiff's age. Here, Ms. Schulte never offered any comparative evidence that Ms. Lawrence – or any other Postal employee – "would have been more diligent or careful in investigating a similarly situated, substantially younger employee (or that [s]he had a prior record of such disparate treatment)." *Crow v. Borg-Warner Automotive Diversified Transmission Products Corp.*, 2000 WL 795321, *10 (S.D. Ind.) (unpublished).

106.   With respect to her claim of wrongful termination, the Postal Service is the prevailing party and shall be entitled to recovery of its costs in this matter.

## CONCLUSIONS OF LAW: 2002 ASP APPLICATION

107.   Comments and actions by persons with no connection to decisions made regarding Ms. Schulte's 2002 ASP application are irrelevant. *Furr v. AT&T Technologies, Inc.*, 824 F.2d 1537, 1547, 1549 (10th Cir. 1987) (repeated statements by managers that plaintiffs were "too damned old," were too old to learn new technologies or to be in management positions, and did not have a future with the company because of age were not direct evidence of a causal relationship between discrimination and failure to promote).

108.   Ms. Schulte offered her own evaluation of her skills and abilities and the subjective evaluation of her expert, Mr. Thomas Stone. However, it is the employer's perception of the plaintiff's abilities that is relevant, not the plaintiff's view of his own qualifications. *Kendrick*, 220 F.3d at 1231 ("[A] challenge of pretext requires us to look at the facts as they appear[ed] to the person making the decision to terminate [the] plaintiff."); *Furr v. Seagate Technology, Inc.*, 82 F.3d 980, 988 (10th Cir. 1996) ("It is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance."), *cert. denied*, 519 U.S. 1056 (1997).

27

109.   Even if the 2002 review committee's assessment of Ms. Schulte's abilities was "incorrect, this does not show pretext unless there is reason to believe the employer failed to exercise its business judgment in good faith." *Wiemer v. Learjet, Inc.*, 2004 WL 2526447, **3 (10th Cir.) (citing *McKnight*, 149 F.3d at 1129 ("An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment. The test is good faith belief.")). The Tenth Circuit specifically cautions courts against second-guessing an employer's business judgment. *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1261 (10th Cir. 2001). Ms. Schulte has produced no evidence that any member of the 2002 review committee is lying about his or her consensus rating of Ms. Schulte's application. Ms. Schulte has also not produced any evidence that the consensus rating was the result of intentional age bias.

110.   Ms. Schulte did not call one member of the 2000 ASP application review committee to testify about any matter in this case.

111.   Even if Ms. Schulte experienced different results from her 2000 ASP application and her 2002 ASP application, the difference does not establish discriminatory intent. The Tenth Circuit has stated:

> Not every difference in treatment, of course, will establish a discriminatory intent. Title VII does not make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal. It prohibits only intentional discrimination based upon an employee's protected class characteristics. Human relationships are inherently complex. Large employers must deal with a multitude of employment decisions, involving different employees, different supervisors, different time periods, and an incredible array of facts that will inevitably differ even among seemingly similar situations. . . . What the law does require is that an employer not discriminate against an employee on the basis of the employee's protected class characteristics.

28

*Kendrick,* 220 F.3d at 1232 (quotations omitted).  Here, Ms. Schulte is comparing the decisions made by different supervisors, separated by years, regarding her application to two different areas of operation.  Comparison is not possible because Ms. Schulte has not introduced any evidence about the 2000 ASP decision makers.  Even if she had, the holding in *Kendrick* renders the comparison immaterial.

112.  The ASP system described by the parties has several factors which would guard against discrimination, including the use of multiple stages of elimination and multiple decision makers as well as extensive written guidelines to be used by the raters.  The law does not require that all subjectivity be erased from the selection process.  "[T]here is nothing unlawful about an employer's basing its hiring decision on subjective criteria," so long as the employer's explanation of its reasons are "clear and specific in order to afford the employee a full and fair opportunity to demonstrate pretext."  *Byrnie v. Town of Cromwell, Bd. of Educ.,* 243 F.3d 93, 104-105 (2d Cir. 2001) (quotation marks and citation omitted); *see also id.* at 105 ("Where an employer's explanation, offered in clear and specific terms, is reasonably attributable to an honest even though partially subjective evaluation of qualifications, no inference of discrimination can be drawn.") (punctuation marks and citation omitted).

113.  "Mere knowledge of an employee's age does not generate an inference that an adverse employment decision was the result of age-based bias. " *Sprague v. Navistar Intern. Transp. Corp.,* 838 F. Supp. 1268, 1278 (N.D. Ill. 1993), *aff'd,* 41 F.3d 1511 (7th Cir. 1994). Plaintiff's expert, Mr. Stone, proceeded with the opposite supposition.

114.  The testimony of former Dewar Postmaster Lynne Jones consisted of no specifics that bore

any relation to Ms. Schulte's employment situation with the USPS. Her testimony was so ambiguous as to wholly fail to eliminate nondiscriminatory explanations for any disparate treatment she may have observed. *Howard v. Garage Door Group*, 2005 WL 481564 (10th Cir.) (unpublished). Evidence of some disparate treatment by the employer based on a defendant's status in a protected class is only relevant if based upon "'comparative analysis of similarly situated individuals.'" *Id.* (quoting *Cone v. Longmont United Hospital Ass'n*, 14 F.3d 526, 532 (10th Cir. 1994)). The testimony of Ms. Jones did not concern or relate to similarly situated individuals. Ms. Schulte provided no evidence of the qualifications, nor positions of the persons about whom Ms. Jones testified and, Ms. Jones never identified any employment action by the relevant decision makers in this case – the 2002 ASP review board. Ms. Jones admitted she knew absolutely nothing about Ms. Schulte's employment with the USPS.

115. Ms. Schulte, having failed to prove that the unfavorable action on her 2002 ASP application was motivated by illegal age discrimination, is not entitled to any monetary recovery.

116. With respect to her wrongful failure to promote claim, the Postal Service is the prevailing party and shall be entitled to recovery of its costs in this matter.

117. To the extent that any of these Conclusions of Law constitute Findings of Fact, they should be so considered.

It is the Order of the Court that judgment be entered in favor of the Defendant, USPS, and against Plaintiff, Ms. Schulte.[2]

ORDERED this ___19___ day of OCTOBER, 2005.

TERENCE C. KERN,
UNITED STATES DISTRICT JUDGE

---

[2]Defendant's Motions in Limine (Dkt. Nos. 45-48) are OVERRULED.  As is reflected herein, the evidence Defendant sought to exclude was considered.

31